No. 60,864

In The Matter Of The Appeal Of AT&T TECHNOLOGIES, INC., From The Order Of The Director Of Taxation.

(749 P.2d 1033)

Opinion filed February 4, 1988.

*Michael C. Cavell,* of Southwestern Bell Telephone Company, of Topeka, argued the cause, and *Lawrence A. Dimmitt,* of the same firm, and *Michael B. Andolina,* of AT&T Technologies, Inc., of Berkley Heights, New Jersey, were with him on the briefs for appellants and cross-appellees, AT&T Technologies, Inc. and Southwestern Bell Telephone Company.

*Thomas E. Hatten,* of Kansas Department of Revenue, of Topeka, argued the cause, and *Mark A. Burghart,* general counsel, was with him on the briefs for appellee and cross-appellant, Kansas Department of Revenue.

*Joseph T. Ruble,* of ADAPSO, of Arlington, Virginia, and *Mark Beshears,* of Goodell, Stratton, Edmonds & Palmer, of Topeka, were on the *amicus curiae* brief for ADAPSO.

*Mark Beshears,* of Goodell, Stratton, Edmonds & Palmer, of Topeka, was on the *amicus curiae* brief for Kansas Society of Certified Public Accountants.

The opinion of the court was delivered by

HOLMES, J.: This is an appeal by AT&T Technologies, Inc., (AT&T) from an order of the State Board of Tax Appeals (BOTA) concerning assessment of state and local sales taxes upon certain

of its services and a cross-appeal by the Kansas Department of Revenue from BOTA's order setting aside the assessment of retailers' compensating (use) tax on software programs transferred by AT&T to Southwestern Bell Telephone Company (Bell). The case was transferred from the Court of Appeals pursuant to K.S.A. 20-3018(c).

Appellant AT&T raises three issues on appeal as follows:

1) Whether state and local taxes pursuant to the Kansas retailers' sales tax act (K.S.A. 79-3601 *et seq.*) are payable on gross receipts from repair services performed by appellant during calendar years 1979, 1980, and 1981, on telephones which had been provided by Bell to its telephone service customers;

2) Whether the BOTA has the authority to order a re-audit of the local sales tax assessed against appellant on gross receipts for installation services which were performed in various Kansas localities; and

3) Whether the BOTA acted unreasonably, arbitrarily, or capriciously in refusing to order abatement of sales tax allegedly assessed on repair services performed outside Kansas.

The Department of Revenue cross-appeals, raising the following issue:

1) Whether the transfer by AT&T of computer software to Bell, for purposes of operating computerized electronic switching system (ESS) equipment located in various central telephone offices, is a taxable transaction under the Kansas compensating tax act (K.S.A. 79-3701 *et seq.*).

The facts are set forth in great detail in the BOTA order and will be briefly summarized here. In early 1982, the Department of Revenue conducted a sales and use tax audit of AT&T, formerly known as Western Electric Company, covering the three-year period from January 1, 1979, through December 31, 1981. The audit resulted in the assessment of additional taxes in the amount of $5,001,524. Following an informal audit review conference, the assessment was amended to reflect a total liability of $3,175,372. The matter was then the subject of a hearing before the Director of Taxation where additional adjustments resulted. AT&T appealed the Director's assessment to the

BOTA, which essentially upheld the sales tax assessment on repair services but abated and set aside an assessment of compensating tax upon software developed by AT&T out of state and furnished to Bell for use in its various telephone offices. AT&T appeals from the BOTA order as to the sales tax assessment and the Department of Revenue cross-appeals from the abatement of the compensating tax assessment. Bell has joined with AT&T in asserting its appeal, presumably pursuant to K.S.A. 1987 Supp. 74-2426(c)(1). Additional facts will be detailed in connection with the various issues on appeal.

## Repair Services

The first issue in the AT&T appeal is whether certain services furnished by AT&T in repairing telephones owned by Bell were subject to sales tax under the Kansas retailers' sales tax act. AT&T asserts error by the BOTA based upon K.S.A. 79-3603(q), which provides:

"For the privilege of engaging in the business of selling tangible personal property at retail in this state or rendering or furnishing any of the services taxable under this act, there is hereby levied and there shall be collected and paid a tax as follows:

. . . .

"(q) a tax at the rate of 3% upon the gross receipts received for the service of repairing, servicing, altering or maintaining tangible personal property *which when such services are rendered is not being held for sale in the regular course of business*, and whether or not any tangible personal property is transferred in connection therewith." (Emphasis added.)

AT&T and Bell contend that the telephones were "being held" by Bell "for sale in the regular course of business" and that the repairs were not subject to sales tax under the statute.

The facts relating to this issue are not disputed. During the audit period AT&T furnished certain services and equipment to Bell, including the repair of telephones used by Bell in providing telephone service to its customers. Bell, during the audit period, was required under tariffs approved by the Kansas Corporation Commission to provide telephones, including maintenance of that equipment, to its telephone service customers if they so requested, although the customers could, if they wished, acquire from third-party vendors their own telephones which could in turn be connected to Bell's lines. The customer, when using telephones provided by Bell, paid an additional sum in

monthly telephone service rates which varied depending upon the number and type of telephones selected by the service customer. If the customer provided the telephones, an adjustment was made by Bell in the monthly cost of the telephone service. Title and ownership of telephones provided by Bell to its customers remained in Bell.

Bell purchased its telephones new from AT&T, and AT&T collected and remitted sales tax on those purchases. These telephones were installed in the homes and businesses of Bell telephone service customers who desired Bell provide them telephones and maintenance. When a telephone malfunctioned, Bell would repair it, if possible, on the customer's premises. If on-site repairs could not be made, Bell would replace the malfunctioning telephone with another, and ship the malfunctioning instrument to AT&T's Merriam, Kansas, service center to be evaluated for possible repair. The Merriam service center processed telephones received from Bell offices in Kansas, Missouri, and Oklahoma. Upon receipt of a telephone, AT&T inspected it to determine whether it could be repaired or whether it should be junked. If it could not be repaired, a nominal charge was made to Bell for the inspection. If repairable, AT&T would place the telephone in an "as new condition" and then return it to Bell. Repaired telephones were returned to Bell offices in each state in proportion to the value of telephones received by AT&T from each state. The telephones lost their individual identity while processed by AT&T, and no claim is made that a repaired telephone was returned to the specific Bell customer who had previously used the instrument. The repaired telephones were merely placed in Bell's inventory for future use in servicing its customers. During the repair process, ownership of the telephones remained with Bell.

AT&T charged Bell a standard amount for repairs based upon the particular style or type of telephone and did not collect or remit sales tax on the repair charges. In the final adjusted assessment by the Division of Taxation, a total of $1,505,463 in state and local sales tax was assessed on the amount received for repair service receipts, of which $1,109,462 was for receipts from repairs to telephones returned to Bell offices outside Kansas, and $396,001 represented tax on repairs associated with telephones returned to Bell offices in Kansas.

The narrow issue before this court is whether these facts represent a situation contemplated by the statutory words, "service of repairing, servicing, altering or maintaining tangible personal property which when such services are rendered is not being held for sale in the regular course of business," contained in K.S.A. 79-3603(q). The Department of Revenue contends that the telephones repaired by AT&T were "not being held for sale in the regular course of business," and therefore the repair services were subject to sales tax. AT&T argues the telephones were being held for sale by Bell in the regular course of its business, emphasizing that the term "sale" is defined very broadly by K.S.A. 79-3602(c), and therefore the repair services were not subject to sales tax.

Sale is defined in the statute as:

" 'Sale' or 'sales' means the exchange of tangible personal property, as well as the sale thereof for money, and every transaction, conditional or otherwise, for a consideration, constituting a sale, including the sale or furnishing of electrical energy, gas, water, services or entertainment taxable under the terms of this act and including, except as provided in the following provision, the sale of the use of tangible personal property by way of a lease or the rental thereof. The term 'sale' or 'sales' shall not mean the sale of the use of any tangible personal property used as a dwelling by way of a lease or rental thereof for a term of more than 28 consecutive days." K.S.A. 79-3602(c).

In addressing this issue, the BOTA stated in part:

"In interpreting the provisions of the sales tax statute the Board notes that since the sales tax statutes are penal they must be strictly construed in favor of the taxpayer. This rule of strict construction, however, does not permit a disregard of manifest legislative intent appearing from plain and unambiguous language. The design of the sales tax statutes is to tax the ultimate consumer of goods when they are sold and not to tax intervening sales. *Capital Electric Line Builders v. Lennen*, [232 Kan. 379, 654 P.2d 464 (1982)].

"In support of its contention that Bell was not holding the handsets for sale (rent) in the ordinary course of its business but rather that the use of handsets was in its business of providing telephone services and therefore meant to be outside the exception contained in K.S.A. 79-3603(q), the Department of Revenue cites the case of *Southwestern Bell Telephone Company v. State Commission of Revenue and Taxation*, 168 Kan. 227, 212 P.2d 363 (1949). The issue in that case was whether Southwestern Bell Telephone Company had to pay compensating tax on the property which it purchased outside the state and brought into the state to be used by it in the operation and maintenance of its telephone system. The Court held that the equipment and property which consisted of, among other

things, its central office equipment, *telephone handsets,* pole lines, wire, cables and the like were, when purchased, subject to the Kansas Compensating Tax. Southwestern Bell Telephone Company had asserted that those items of property became an ingredient or component part of taxable telephone services and therefore were not separately taxable as the sales tax is collected upon the provision of the telephone service." (Emphasis in original.)

In *Southwestern Bell Tel. Co. v. State Commissioner of Revenue & Taxation,* 168 Kan. 227, 212 P.2d 363 (1949), Bell sought to avoid the imposition of a compensating tax upon equipment, including telephones, purchased out of state and brought into Kansas for use by Bell in furnishing its telephone service to its customers. It was Bell's contention, *inter alia,* that,

"the property in question [including telephones installed in customers' premises] is used and enters into the processing of and becomes an ingredient of the service it furnishes. In other words, it argues that its instruments, poles, wire and other similar property bears the same relation to its telephone service that a carload of hides would to one engaged in the manufacture of shoes or a carload of flour does to a baker." 168 Kan. at 232.

After discussing the relationship between the sales tax and the compensating tax, the Court stated:

"There is one basic principle about our sales tax act. It is that the ultimate consumer should pay the tax and no article should have to carry more than one sales tax. The intention was that in the various steps between a loaf of bread and the wheat field the person who bought the wheat from the farmer should not pay a sales tax nor the mill that bought it from the elevator man nor the jobber who bought the flour from the mill nor the baker who bought the flour from the jobber. To prevent such a result as nearly as possible, G.S. 1947 Supp. 79-3602(k) was enacted. It had to be so. It should be noted that for each step from the wheat field to the bakery the title to the wheat and flour passed. It was bought each time with the idea of the title passing and there being a resale. This is not true of the property in question here. When the telephone company buys a pole and sets it in the ground the pole belongs to it and the title does not pass to anyone of the telephone company's service. When the baker buys a new oven or the shoemaker a new machine or the shirtmaker a new sewing machine, he pays a sales tax on these purchases because they are the ultimate consumers, the title has come to rest, no further transfer of title is contemplated." 168 Kan. at 233.

The court determined Bell was liable for payment of compensating tax upon its purchase of telephones, as well as other equipment, in that the property did not become a part of the sale of services to its customers, stating:

"Here it seems clear that the property in question is finally used by the plaintiff [Southwestern Bell]." 168 Kan. at 235.

The BOTA, in addition to *Southwestern Bell*, relied upon *Nashville Mobilphone Co., Inc. v. Woods*, 655 S.W.2d 934 (Tenn. 1983), stating:

"The Department cites the Board to the Tennessee case of *Nashville Mobilphone Co., Inc. v. Woods*, 665 S.W.2d 934, 937 (Tenn. 1983). That case involved the taxability of purchases made by Mobilphone. Mobilphone contended that the radiophones it purchased for use in its mobilephone service were purchased for resale (rental) to the public and therefore the sale to Mobilphone was exempt as 'sale or sales for resale.' The Court explained the distinction to be applied when equipment is used to provide a taxable service:

'The trial judge relied upon and cited numerous other cases involving sales of equipment to hotels, airlines, bowling alleys and the like, where all or part of such equipment was later leased or rented to customers in exchange for charges, some of them involving maintenance fees. In the great majority of these cases purchases of such equipment were held to be taxable, as not constituting sales for resale, even though use of the facility or equipment was later made by customers who paid therefor. See, e.g., *Atlanta American Motor Hotel Corp. v. Undercofler*, 222 Ga. 295, 149 S.E.2d 691 (1966); *Boise Bowling Center v. State*, 93 Idaho 367, 461 P.2d 262 (1969); *Sta-Ru Corp. v. Mahin*, 64 Ill. 2d 330, 1 Ill. Dec. 67, 356 N.E.2d 67 (1976); *Kentucky Board of Tax Appeals v. Brown Hotel Company*, 528 S.W.2d 715 (Ky. 1975); *Sine v. State Tax Commission*, 15 Utah 2d 214, 390 P.2d 130 (1964).

'The general theme of all of these cases is that when the primary function and purpose of the taxpayer is to provide services, the ownership, use and maintenance of certain types of personal property and equipment are necessary in order to enable it to furnish the services so that the taxpayer, not the customer, is the ultimate user or consumer within the meaning of the sales and use tax statute.'

"The facts in that case, as in this case, show that the taxpayer did not rent its telephone equipment to the general public, but only to its subscribers, even though a subscriber could furnish its own equipment and still obtain the service. The facts in the *Mobilphone* case are remarkably similar to the facts of this case. The Court there found that Mobilphone was the ultimate user of the equipment. Mobilphone was not in the general business of renting radiophones or signaling equipment for general use by the public. It only rented or leased its equipment to its own subscribers who, in every instance, also utilized its service as a radio common carrier. So it was with Bell during the audit period.

"Also involved in the *Mobilphone* case was the issue of taxability of repairs to the Mobilphone equipment by another taxpayer corporation. In the *Mobilphone* case, Melrose Electronics Inc. did repair and maintenance work on equipment leased or rented to the subscribers of Mobilphone. Mobilphone contended that the repairs by Melrose Electronics to its equipment were non-taxable since it held the phones for resale. The discussion of the facts is not substantial enough for the Board to determine whether the issue is the same as presented to the Board in this case but the Board does note that the Court found the repairs to be taxable."

In concluding that AT&T was liable for sales tax upon the services it rendered Bell in repairing Bell's telephones, the BOTA stated:

"Applying the principles discussed above to the facts of this case, the Board therefore determines that for purposes of application of K.S.A. 79-3603(q) the handsets and other customer premises equipment owned by Bell and furnished to its customers as part of its telephone service were not, during the audit period, held by it for sale in the regular course of business. Bell used the handsets and other customer premises equipment to provide its telephone service. The repairs by the taxpayer to the Bell owned equipment are therefore taxable under K.S.A. 79-3603(q) and the taxpayer should have collected sales tax on the gross receipts from the service of repairing the equipment."

We think *Nashville Mobilphone*, when read in conjunction with our opinion in *Southwestern Bell*, is persuasive for its holding that repair services performed on Nashville Mobilphone, Inc., radio phones by Melrose Electronics, Inc., an independent corporation, were subject to sales tax under Tennessee's sales tax statute. Because the court there held that Nashville Mobilphone, and not its service customers, was the primary user or consumer of the equipment, it reasoned that Melrose Electronics was not furnishing repair services on equipment held for purposes of resale, and its repair service charges were therefore subject to the sales tax on services. In *Southwestern Bell* we held that Bell is the final user of its equipment, including telephones, necessary to provide service to its customers. It was on that basis that *Nashville Mobilphone* concluded that repair services to such equipment could not avoid sales tax because the equipment was not being held for resale. We think *Southwestern Bell* is controlling for its holding that the telephone company is the final user or consumer of telephones and other equipment necessary to enable it to provide services to its customers. An attempt was made at oral argument to distinguish *Southwestern Bell* from the present case based upon the extensive technical advances and changes since 1949. While it may be conceded that the entire telecommunications industry has undergone great changes, that fact does not change the basic holding of *Southwestern Bell*. The telephones used here in providing services to Bell's customers apparently were used in the same manner as the telephones in

*Southwestern Bell.* The telephones in question were at all times the property of Bell and we conclude that the BOTA was correct in its determination that the repaired telephones were not "being held [by Bell] for sale in the regular course of business." K.S.A. 79-3603(q). The repair of such equipment by AT&T was correctly found to be subject to the Kansas retailers' sales tax.

Re-Audit of Local Sales Tax on Installation Services

The second issue raised by AT&T is whether the BOTA acted within its authority in ordering a re-audit on that portion of the sales tax assessment representing local sales tax on receipts from installation services performed by AT&T personnel for Bell. Whether such services were subject to sales tax is not in dispute. The Department of Revenue assessed local sales tax, however, based upon the location of AT&T's service center in Merriam, Johnson County, Kansas. The services were actually conducted throughout the state by personnel stationed in Dodge City, Wichita, Salina, and Topeka.

On November 18, 1985, the Director of Taxation ordered a re-audit of the assessment to comply with this court's decision in *Capital Electric Line Builders, Inc. v. Lennen,* 232 Kan. 379, 386, 654 P.2d 464 (1982), *modified on other grounds and reh. denied,* 232 Kan. 652, 658 P.2d 365 (1983), which held that services are subject to the local sales tax of the locality in which the services are actually performed. *Capital Electric* was decided after the assessment by the Department of Revenue in this case.

The total amount of local tax assessed on installation labor was $377,342 based upon the local sales tax rate in Merriam, Kansas. AT&T essentially argues that the BOTA should have abated the assessment in its entirety as being void, and that the BOTA had no authority to remand the assessment for a re-audit. AT&T also contends that a re-audit is barred by the statute of limitations. The Department of Revenue contends that the order for a re-audit is not a final order which is appealable. None of these arguments have merit. The BOTA disposed of this issue, stating:

"The audit disclosed that the taxpayer had performed installation services for Bell but had not paid sales tax on the receipts attributable to such services performed within the State of Kansas. The audit assessed all of the sales tax on installation services as though those services had been performed in Merriam,

Johnson County, Kansas. The amount of local sales tax attributable to installation services which was included in the original sales tax assessment was $377,342.00. The Order of the Director of Taxation made November 18, 1985, directed a re-audit to conform the assessment to the findings of the case of *Capital Electric Line Builders v. Lennen,* 232 Kan. 379, 654 P.2d 464 (1982). In this regard, the Director of Taxation agreed with the taxpayer and recognized that the audit had improperly applied sales tax on repairs [*sic*] [installation services] made outside of Merriam, Kansas. This issue remains for determination by the Board because apparently the audit staff of the Department of Revenue has been unable to gather the information necessary to make the adjustments. The Department of Revenue asserts that the audit staff was denied access to information and supporting documentation. The taxpayer denies that allegation. Regardless of the reason for the inability or failure of the audit staff to re-audit, the Board believes that the audit should be performed and the assessment adjusted in accordance with the Director's original Order and the decision of *Capital Electric Line Builders.* The Board does not agree that the failure of the Department of Revenue to complete a re-audit renders the assessment null and void. The Board believes that the taxpayer now bears the burden of coming forward with its records to justify an adjustment of the original assessment. The Board did not have sufficient evidence at the hearing to determine that the taxpayer had intentionally failed to provide information requested by the Department in order to complete a re-audit. The Board therefore believes that the Department of Revenue should undertake a re-audit for the purpose of determining the proper amount of sales tax to be applied and that the taxpayer must furnish whatever documentation the Department reasonably needs to determine the proper amount of local sales taxes."

We conclude that the BOTA is vested with the power to order a remand to the Department of Revenue to properly determine the amount of the assessment. When the evidence is insufficient or additional evidence, findings, or conclusions are necessary to properly determine an issue, the BOTA has the implied, if not specific, authority to require additional proceedings. K.S.A. 74-2437 grants to the BOTA the authority to hear appeals from the director of taxation. Such authority includes appeals from assessments of sales tax and carries with it the authority to require proceedings sufficient for the BOTA to make a rational determination of the issues.

Based upon *Capital Electric,* the assessment of local sales tax should have been based upon the local tax where the services were rendered and not upon the local tax applicable in the City of Merriam. The BOTA acted properly in ordering the re-audit to comply with the requirements of *Capital Electric.* Appellant's arguments concerning the statute of limitations have been care-

fully considered and we find them to lack merit. The matter must be remanded to the BOTA to carry out its directive of a re-audit of this portion of the assessment.

### Sales Tax Allegedly Assessed on Out-of-State Repairs

The third and last issue raised by AT&T is whether the BOTA's refusal to order abatement of sales tax allegedly assessed on repair services performed out of state, on telephones delivered to Bell in Kansas, was unreasonable, arbitrary, and capricious. AT&T alleges that the December 1985 final assessment included $43,669 in sales tax on services not subject to the Kansas sales tax since the services were performed outside the state. That Kansas sales tax may not be imposed on such services is not in dispute and is conceded by the Department of Revenue.

The testimony presented by AT&T before the Director of Taxation indicated that this sum had been removed in the process of amending the assessment. In testimony presented to the BOTA, however, AT&T's witness testified that an amount of $43,669 originally assessed for repairs performed elsewhere had *not* been abated in the December 1985 amended assessment. The appellee's employee who had been responsible for performing the audit also testified. When asked on cross-examination whether the disputed amount had been included in the December 1985 final assessment, he stated that he could not remember, nor could he remember deleting the amount.

On the basis of this testimony, the BOTA disposed of this issue as follows:

"The final issue for determination of the Board is whether the original sales tax assessment includes assessments for repairs made by the taxpayer to Bell equipment which repairs were performed outside of the State of Kansas. The Department of Revenue has conceded that repair operations performed outside of Kansas are not subject to Kansas Sales or Compensating Tax and that any part of the assessment based upon repairs made outside the State of Kansas should be deleted from the assessment. The taxpayer bears the burden of proof as to amounts claimed for out of state repairs. The Board is unable to determine from the exhibits or the testimony the amount of the deletions, if any, which should be made and therefore denies the taxpayer's appeal in this regard."

While it is true that K.S.A. 77-621(a)(1) places the burden upon AT&T to prove the invalidity of the assessment, it would appear to us that whether the $43,669 was erroneously assessed should be readily ascertainable in the records of the Department of

Revenue. If sales tax was assessed upon services performed out of state, that portion of the assessment should be abated. We have carefully reviewed the record including the documents submitted by both parties and they are not conclusive either way. In the interests of justice to the taxpayer, we are of the opinion that this portion of the assessment should be remanded to the BOTA, which in turn should remand the issue to the Department of Revenue for further proceedings sufficient to make a proper determination.

## Cross-Appeal

We now turn to the cross-appeal of the Department of Revenue. As a part of the 1979-1981 audit, the Department of Revenue assessed a compensating tax pursuant to K.S.A. 79-3701 *et seq.* against certain computer software developed by AT&T outside of Kansas for use by Bell in Kansas. As in the issues raised by AT&T in its appeal, the basic facts are not seriously in dispute.

During the audit period, AT&T developed software under contract for Bell to use in its offices located in Kansas. The software was specifically tailored according to the unique requirements specified by Bell to suit each of its different central switching offices that used computerized switching equipment. The computerized switching equipment (hardware) was manufactured and sold by AT&T to Bell. The software to be used with the hardware was developed, or programmed, in locations outside Kansas. It was provided to Bell's Kansas offices under a nonexclusive license granting Bell the right to use the software in consideration for license fees payable by Bell to AT&T. AT&T retained ownership of and proprietary rights to the software and provided periodic updates of the software programs. The electronic switching system software is referred to throughout the record as ESS software but will be referred to in this opinion simply as software except when it is necessary to specifically identify the ESS software.

The programmed instructions comprising the software were physically transmitted to Bell central telephone offices by means of magnetic tape or magnetic cards. AT&T collected and remitted tax on the gross receipts from the magnetic media, but did not do so on the gross receipts from the license fees for the software.

The Department of Revenue assessed compensating tax on the amount billed by AT&T for the software license fees, resulting in a total tax of $221,562, excluding interest.

Based upon these facts, the BOTA initially determined that the software was intangible personal property. It reasoned that a distinction was drawn between operational software and application software by this court in *In re Tax Protest of Strayer*, 239 Kan. 136, 716 P.2d 588 (1986), and that "[t]he facts in this case are abundantly clear that the ESS software is application software." Next, the BOTA determined that the compensating tax statutes (K.S.A. 79-3701 *et seq.*) expressly apply only to the "use" of *tangible* personal property, and therefore found that the software fees were not subject to *compensating* tax, regardless of whether they would have been subject to Kansas *sales* tax.

In reaching its determination that the ESS software was not subject to the compensating tax, the BOTA stated, in part:

"The first issue the Board will deal with is whether the ESS software is tangible personal property or intangible personal property. The significance of this determination will become apparent later in this Order.

"K.S.A. 79-3602(f) defines 'tangible personal property' as 'corporeal personal property'. Corporeal personal property is not further defined in the statute. The courts and legislatures around the country have, over the last few years, addressed the issue of whether computer software is tangible personal property or intangible personal property. In 1986, the Kansas Supreme Court addressed this issue for the first time in the case of *In Re Tax Protest of Thomas D. Strayer, supra*. The issue in the *Strayer* case arose out of a property tax assessment by the Graham County Appraiser upon computer software licensed to Thomas Strayer. The value of the software was based upon the initial fee charged for the software. This Board had made the determination that computer software was tangible personal property and subject to personal property taxation. The Supreme Court first reviewed the nature of computer software and its interaction with the computer hardware. The Court said at page 137:

'[A] functioning computer is a combination of hardware and computer programs, sometimes called "software." The electronic data processing industry is made up of a number of companies which offer numerous types of products and/or services to users of electronic data processing equipment. The data processing equipment is often referred to as computer hardware. Computer programs are the instructions which make the data processing equipment perform tasks and include "operational programs," which orchestrate the basic functions of the computer, and "application programs," which provide the particularized instructions adapted for specialized programs.'

The Court reviewed the evolution of the theory regarding taxation of computer software from the time IBM announced that it would price its hardware sepa-

rately from software and services. The Board will not undertake a complete review of the theories and application of the various states which were thoroughly reviewed by the Court in the *Strayer* case, but would note as the Court does at page 138:

> 'Almost all states which have considered the nature of computer software have found that the software is intangible personal property. This is generally based on the idea that the information contained on the software is the product being sold, that this information can be transmitted in many forms, including over the telephone, and that the information often becomes outdated and must be replaced. Only one state has found that software is tangible personal property, but the appellate court noted it could not determine from the record how to apportion the purchase price between operational and application functions of the software.' (See *District of Columbia vs. Universal Computer Assoc., Inc.*, 465 F.2d 615 (D.C. Cir. 1972); *Commerce Union Bank v. Tidwell*, 538 S.W.2d 405 (Tenn. 1976); *First National Bank v. Dep't of Revenue*, 85 Ill. 2d 84, 421 N.E.2d 175 (1981); *James v. Tres Computer Service, Inc.*, 642 S.W.2d 347 (Mo. 1982); *Maccabees v. Treasury Dep't.*, 122 Mich. App. 660, 332 N.W.2d 561 (1983); *State v. Central Computer Services, Inc.*, 349 So. 2d 1156 (Ala. App. 1977); *Greyhound Computer v. St. Dep't*, 271 Md. 674, 320 A.2d 52 (1974).
>
> "The Kansas Supreme Court goes on to determine that:
>
> '. . . Under the tax statutes, software programs which constitute the operational programs, without which a computer cannot operate, have a value that is to be considered an essential portion of the computer hardware and therefore taxable as tangible personal property in conjunction with the hardware. Application programs, which are particularized instructions adopted for special programs, are intangible property and not subject to the personal property tax for tangible personal property.'

The question then arises whether this distinction between operational programs as tangible personal property and application programs as intangible property carries over to the sales tax statutes. The Board believes that the same distinctions are applicable for sales tax purposes. The Court in *Strayer* looked to the definition of "tangible" contained in the sales tax statutes at K.S.A. 79-3602(f). For intangibles the Court looked at the Uniform Commercial Code at K.S.A. 84-9-106. The Board cannot find that computer software which is intangible property for purposes of property taxation can somehow become tangible property when looking to its taxability under the sales tax statutes.

"Thus, in Kansas, whether computer software is tangible property or intangible property depends upon whether it is operational software or application software. The facts in this case are abundantly clear that the ESS software is application software. It contains particularized instructions adopted for special programs unique to each central office. It is designed to meet the special needs of a single customer for a specific telephone central office and could not be used by another customer, or by Bell at another telephone central office, without major modification. The Board therefore determines that the ESS software is intangible property.

"Both the taxpayer and the Department of Revenue agree that if the right-to-

use fees for the ESS software are taxable it is under the Kansas Compensating Tax provisions found at K.S.A. 79-3701 *et seq.* The taxpayer contends that K.S.A. 79-3701 *et seq.* does not tax the use of intangible personal property even if such property would have been taxed under the Sales Tax Act.

"The Sales Tax Act is incorporated by reference by K.S.A. 79-3702(b) which states:

'(b) The meaning ascribed to words and phrases in K.S.A. 79-3602, insofar as practicable, shall be applicable herein unless otherwise provided. The provisions of K.S.A. 79-3601 to 79-3625, both inclusive, relating to enforcement, collection and administration, insofar as practicable, shall have full force and effect with respect to taxes imposed under the provisions of this act.'

K.S.A. 79-3703 imposes a tax:

'. . . for the privilege of using, storing, or consuming within this state any article of tangible personal property. Such tax shall be levied and collected in an amount equal to consideration paid by the taxpayer multiplied by the rate of three percent (3%). All property purchased or leased within or without this state subsequently used, stored or consumed in this state shall be subject to the compensating tax if the same property or transaction would have been subject to Kansas retailers' sales [tax] had the transaction been wholly within this state.'

The word 'use' is defined by K.S.A. 79-3702 as:

'(c) The word "use" means and includes the exercise within this state by any person of any right or power over tangible personal property incident to the ownership of that property, . . .'

The taxpayer asserts that the definition of the word 'use' is tied to the use of *tangible* personal property and that the use of intangible personal property is not covered by the Kansas Compensating Tax statutes. The problem arises because the last sentence of K.S.A. 79-3703 refers to 'all property . . .*'used'* . . .' and then provides that the property shall be subject to compensating tax if it would have been subject to Kansas Retailers' Sales Tax had the transaction been wholly within Kansas. The term *'use'* contained in K.S.A. 79-3702(c) appears to be limited to use of 'tangible personal property' but the Kansas Retailers' Sales Tax is applicable to both tangible and some intangible personal property. The Board is unable to find any Kansas case which applies compensating tax to intangible property. Further the Board has been unable to find any legislative research materials which would assist the Board in interpreting the scope of K.S.A. 79-3703. That statute as originally passed in 1937 did not contain the definitions of K.S.A. 79-3702 and in particular the definition of 'use' found at subparagraph (c). It also did not contain the last sentence of K.S.A. 79-3703 which states:

'All property purchased or leased within or without this state and subsequently used, stored or consumed in this state shall be subject to the compensating tax if the same property or transaction would have been subject to Kansas retailers' sales tax had the transaction been wholly within this state.'

The definition of the word 'use' was added in 1945. The last sentence of K.S.A. 79-3703 was added in 1953, but unfortunately, there is no legislative history to indicate the reason for the addition of that last sentence.

"The Board therefore must apply the rules of statutory construction to determine whether K.S.A. 79-3703 applies to the *use* of intangible property.

"The first rule of construction when dealing with tax statutes is that they will not be extended by implication beyond the clear import of the language employed therein, and their operation will not be enlarged so as to include matters not specifically embraced. *Director of Taxation, Department of Revenue v. Kansas Krude Oil Reclaiming Co.*, 236 Kan. 450, 691 P.2d 1303 (1984). And in the same vein, sales tax statutes are penal, and thus must be strictly construed in favor of the taxpayer. *Appeal of J.G. Masonry, Inc.*, 235 Kan. 497, 680 P.2d 291 (1984). Where there is reasonable doubt as to the meaning of the taxing act, it will be construed most favorably to the taxpayer. *National Coop Refinery Assoc. v. Bd. of Co. Commrs. of McPherson County*, 228 Kan. 595, 618 P.2d 1176 (1980). In construing the statutes, legislative intention is to be determined from a general consideration of the entire act; effect must be given, if possible, to the entire act and every part thereof, and, to this end, it is the duty of the Court, so far as practicable, to reconcile different provisions so as to make them consistent, harmonious, and sensible. *Wirt v. Esrey*, 233 Kan. 300, 662 P.2d 1238 (1983).

"The Board believes that the term 'using' and the term 'used' found in K.S.A. 79-3703 must be interpreted by application of the definition of the word 'use' found in K.S.A. 79-3702(c). 'Use' in subparagraph (c) means 'the exercise within this state by any person of any right or power over *tangible personal property* incident to the ownership of that property . . . .' There is no dispute between the taxpayer and the Department of Revenue that if the Kansas Compensating Tax is applicable to the right-to-use fees, it is because the property is used within this state. The only compensating tax which is applicable to property used in this state is where that property is tangible personal property as 'use' is defined in K.S.A. 79-3702(c). It is within that definition of the word 'use' that K.S.A. 79-3703 imposes a tax. Clearly the first sentence of K.S.A. 79-3703 is inapplicable since it specifically states that the tax is '. . . for the privilege of *using* . . . within this state any article of *tangible personal property*.' The last sentence of K.S.A. 79-3703 starts with the words 'All property' which would at first appear to include both tangible and intangible property, but goes on to state that it is 'All property . . . *used* . . . in this state.' What does the term 'used' in this sentence mean? The Board believes that it means 'used' within the meaning of the word 'use' as that term is defined at K.S.A. 79-3702(c). Therefore, the Board finds that, construing the statute strictly against the Department of Revenue and in favor of the taxpayer, there is no imposition of compensating tax for the use of intangible property even if that same property or transaction would have been subject to the Kansas Retailers' Sales Tax had the transaction been wholly within the state."

We concur in the conclusions reached by the BOTA. The compensating tax is also popularly known as a "use" tax upon property purchased out of state and used, stored, or consumed in this state. While the Kansas retailers' sales tax act and the Kansas compensating tax act complement each other, they are not identical. K.S.A. 79-3603 provides for a sales tax on tangible personal

property and certain services set forth in the statute. K.S.A. 79-3703 provides for a compensating tax on tangible personal property purchased outside the state and brought into Kansas. It does not assess a compensating tax on intangible property or on services.

The Department of Revenue relies heavily on K.S.A. 79-3603(s), which purports to apply sales tax to computer software. Regardless of its effect upon software purchased in Kansas, it is not a definitional statute that defines software as tangible personal property, as the Department of Revenue contends. Nor does K.S.A. 1987 Supp. 79-3703 apply to intangible property. The statute is clear in assessing a compensating tax on *tangible personal property,* and the last sentence which refers to all property does not expand the tax to intangible property even if such property might be subject to sales tax under 79-3603.

Nowhere in the retailers' sales tax act is "use" defined in a manner that would be applicable to the compensating tax act. The definitions in K.S.A. 79-3602 which may be applicable to the compensating tax act by reason of K.S.A. 79-3702(b) do not define "use." Also, the definition of "tangible personal property" in K.S.A. 79-3602(f) does not purport to cover computer software. Whether K.S.A. 79-3603(s) was intended to apply the sales tax to computer software as a form of tangible personal property or as a service we need not determine here. If it had been the intent of the legislature, when it enacted K.S.A. 79-3603(s), to impose a compensating tax on computer software purchased out of state it could easily have been accomplished by amending the appropriate statutes.

We agree with the BOTA that computer software, at least to the extent that it is application software as recognized in *Strayer,* is intangible personal property and as such does not come within the compensating tax act which specifically applies only to tangible personal property. It is also clear that the compensating tax does not apply to services. Regardless of what the scope of K.S.A. 79-3603(s) may be in relation to the assessment of sales tax, we think it is clear that it has no application to the compensating tax. We have considered all the various arguments of the Department of Revenue and find them without merit.

In conclusion, we affirm the decision of the BOTA upholding

the taxability of the AT&T repair services on Bell telephones; we affirm the authority of the BOTA to order a re-audit of the local sales tax included in the sales tax on repair services; we direct the BOTA to remand the issue of sales tax allegedly assessed on repair services performed outside Kansas to the Department of Revenue for a proper determination of the amount, if any, of the assessment which should be abated; and we affirm the decision of the BOTA that the ESS software purchased out of state was not subject to compensating tax.

The decision of the BOTA is affirmed in part and reversed in part, and the matter is remanded to the BOTA to proceed in accordance with the views expressed herein.